STATE EX REL. CLARENCE A. H. MEYER, ATTORNEY GENERAL OF THE STATE OF NEBRASKA, APPELLANT, V. WILLIAM E. PETERS, TAX COMMISSIONER OF THE STATE OF NEBRASKA, APPELLEE.

215 N. W. 2d 520

Filed February 14, 1974.    No. 39268.

Clarence A. H. Meyer, Attorney General, and Ralph H. Gillan, for appellant.

Crosby, Pansing & Guenzel and Theodore L. Kessner, for appellee.

Heard before SPENCER, BOSLAUGH, SMITH, McCOWN, NEWTON, and CLINTON, JJ., and LYNCH, District Judge.

SPENCER, J.

This declaratory judgment action seeks a judicial determination of the constitutional validity of L.B. 945, Eighty-second Legislature, First Session, 1971. L.B. 945 makes several unrelated changes in the property tax laws. These are contained in sections 1, 2, and 3. Sections 4 to 11 of the Act constitute completely new and separate legislation directed toward solving the difficult problem of intercounty equalization where a taxation district overlaps two or more counties. Sections 1, 2, and 3 are not related or interdependent in any way, and sections 4 to 11 have no essential relationship to sections 1, 2, or 3. The only characteristic common to these sections is their relation to property taxation.

This is the second appearance of the action. See State ex rel. Meyer v. Peters (1972), 188 Neb. 817, 199 N. W. 2d 738. In that earlier appearance we held section 1 to be unconstitutional and section 3 to be constitutional. This opinion is particularly concerned with sections 2 and 7 to 11.

Section 2 amended section 77-202 (1) (d), R. S. Supp., 1969, to read as follows: "(1) The following property

shall be exempt from taxes: * * * (d) Houshold goods, *including major appliances either attached or detached to real property,* and personal effects when such property is not owned or used for financial gain or profit to either the owner or user." (Emphasis supplied.)

The italicized portion of the above statutory language was added by L.B. 945. The Attorney General, who will hereinafter be referred to as plaintiff, attacks this exemption as contravening that portion of Article VIII, section 2, of the Constitution of Nebraska, which states: "Household goods and personal effects, as defined by law, may be exempted from taxation in whole or in part, as may be provided by general law, * * *."

The key question is the intention of the amenders of the Constitution relating to the words "as defined by law." Is the power of definition given to the Legislature? Or did the framers of the amendment intend to adopt the common law concepts relating to fixtures?

Prior to 1954, Article VIII, section 2, of the Nebraska Constitution, provided: "Household goods of the value of two hundred ($200.00) dollars to each family shall be exempt from taxation." The 1954 amendment deleted the $200 maximum limit for this exemption. The parties to this action, however, disagree as to the significance of the phrase "as defined by law" which was added by that amendment. Was it intended to mean within the specific dollar limit set by law, or was it intended to give the Legislature the power to define household goods? The previous provision neither defined the phrase "household goods" nor authorized the Legislature to do so. It specifically set the limit of the exemption at $200.

The trial court held that Article VIII, section 2, was a grant of power to the Legislature to define "household goods" by the enactment of general laws, and found that section 2 of L.B. 945 was such an enactment. The court further found that nothing in the Constitution re-

stricted these definitional powers of the Legislature to the common law concepts relating to fixtures.

Frost v. Schinkel (1931), 121 Neb. 784, 238 N. W. 659, reviews the common law rules relating to fixtures. These rules are largely codified in section 77-103, R. R. S. 1943. The term "household goods" would not normally encompass fixtures. Plaintiff relies upon Moeller, McPherrin & Judd v. Smith (1934), 127 Neb.. 424, 255 N. W. 551, for the proposition that the Legislature cannot invoke its powers of statutory definition to nullify constitutional provisions.

Plaintiff assumes for the sake of discussion that the major appliances in question are those which are permanently installed in the home, and could not be removed without major damage to the home. Examples are built-in dishwashers which are put into a space in the kitchen especially built for them and attached to the plumbing so that they could not ordinarily be removed by the average homeowner. Other examples would be garbage disposal units and built-in ranges and ovens. Certainly they can be and are replaced, but only by plumbers, electricians, and other skilled workmen, and their removal without replacement would leave the real estate scarred, disfigured, and incomplete. As long as the exemption is given only to detached personal property, no great difficulty is encountered in identifying household goods and personal effects. But, if we start including built-in appliances which have traditionally been a part of the real estate, where do we stop? An ordinary window air conditioner is included in the exemption. How about a central air-conditioning system or a furnace, if attachment to the real estate does not disqualify? All these appliances are regarded as part of the real estate for the purpose of descent and distribution, conveyances, mortgages, homestead exemptions, or other purposes of like nature.

Plaintiff argues that the Legislature, in amending sec-

tion 77-202 (1) (d), R. S. Supp., 1969, assumed that major appliances attached to real estate were a part of that real estate or there would have been no occasion to make specific provision for them. This points up the question of whether the voters who adopted the constitutional amendment authorizing the exemption of household goods and personal effects had in mind authorizing an exemption of real estate. Obviously, they did not.

Plaintiff states that after extensive research the only case which casts any light on the subject is Kramer v. Beebe (1917), 186 Ind. 349, 115 N. E. 83. In that case the court said: "In our opinion 'household goods,' as used in § 119, must be understood to mean those articles with which a residence is equipped, other than fixtures, designed in their manufacture as instruments of the household, and embrace the articles necessary, convenient, or ornamental, requisite to enable the delinquent not merely to live, but to live in a convenient and comfortable manner." This is certainly the common and ordinary meaning of the term. It is not illogical to assume it is the one the voters had in mind when they approved the constitutional amendment.

Any definitional powers given to the Legislature are prefixed and limited. The power to define household goods and personal effects necessarily is limited to those articles which ordinarily would be understood to be embraced within that term. Certainly, it cannot be interpreted to give the Legislature power to include air-conditioning systems, furnaces, automobiles, or real estate within the term "household goods and personal effects." Since there must be a limit to such powers, it is reasonable to find the common law concepts serve as guides.

To this point, we have been assuming that the Legislature was expressly granted certain definitional powers. This point, however, is not so clear when we read Article VIII, section 2, in its entirety. The critical portion thereof refers to household goods *"as defined by law,"* and

states they may be exempted in whole or part *"as may be provided by general law."* This of itself reveals a distinction of some sort. We believe it was intended to give the Legislature unlimited power to specify exemptions within the usual limits of the meaning of "household goods and personal effects." The phrase *"as may be provided by general law"* refers to actions of the Legislature which are to occur in the future. The former phrase, if different, refers to the legal meaning of household goods as understood and judicially defined. Both the common law and the then current statutory definitions distinguished household goods from fixtures.

We find the intention to be to allow the exemption of all household goods as that term was understood and legally defined. In that sense, the phrase in question would serve both to describe and limit the allowable exemption. Such an interpretation seems to us to be more plausible than the one asserted by the defendant.

This interpretation finds support in the remainder of Article VIII, section 2. To be particularly noted is the language: "The Legislature may classify personal property in such manner as it sees fit, and may exempt any of such classes, or may exempt all personal property from taxation." This indicates that the framers of the constitutional provision knew well how to employ language to grant broad powers of definition and classification. It is significant that similar language was not utilized in regard to household goods. We thus hold that no broad definitional powers were granted to the Legislature by Article VIII, section 2.

In any event, any power to define household goods must be limited for the term "household goods" to have any meaning whatever. It is obvious that the Legislature could not be allowed to define all property in the state as household goods and personal effects. To permit it to do so would allow it to negate other parts of the Constitution. We therefore hold that the language

"household goods and personal effects, as defined by law," referred to extant law in a descriptive and limitational manner. We find that part of section 2 of L.B. 945 to be unconstitutional.

We are next concerned with sections 7 through 11 of L.B. 945, or sections 77-1506.04 through 77-1506.08, R. R. S. 1943. They provide as follows:

"When a taxing district lies in two or more counties, the total amount of taxes levied by such district shall be apportioned by each respective county on the basis of equalized valuations for the current assessment year, as determined by application of the respective county assessment ratio developed by the Tax Commissioner, in the proportion that the equalized valuation of that part of such district lying in each county bears to the equalized valuation of the whole district." § 77-1506.04, R. R. S. 1943.

"It shall be the duty of the county board of equalization which has the responsibility for fixing the mill levy for such overlapping district to determine the average ratio of assessment of real estate developed by the Tax Commissioner for each of the respective counties into which such taxing district extends or includes." § 77-1506.05, R. R. S. 1943.

"When the county board of equalization finds that the average assessment ratio for any of the respective counties varies not more than five percentage points from those ratios for other counties into which such district extends, apportionment as provided in section 77-1506.05 shall not be deemed necessary. When the county board of equalization finds that the average assessment ratio for any of the respective counties varies more than five percentage points from those ratios for other counties into which such district extends, apportionment of the tax levied, as provided in section 77-1506.05, shall be made as provided." § 77-1506.06, R. R. S. 1943.

"When apportionment of the total taxes levied by any

district lying in two or more counties has been accomplished as provided in sections 77-1506.04 to 77-1506.06, the county board of equalization shall fix separate and distinct mill levies for those parts of such districts lying in each county into which it extends. Such mill levy shall be fixed at a rate which, when applied to the assessed valuations of property within such part of a district in each respective county, will raise the amount of taxes apportioned pursuant to section 77-1506.05." § 77-1506.07, R. R. S. 1943.

"The provisions of sections 77-1506.04 to 77-1506.07 shall not be applicable when the mill levy adopted by the levying authority of any governmental subdivision is five mills or less." § 77-1506.08, R. R. S. 1943.

There is a complete absence of any provision for notice to the taxpayers in the taxing district of an intention to adjust the mill levies in accordance with the above sections. It is also apparent that no provision has been made for any hearing on the adjustment. Further, there is no provision for notice and hearing before the Tax Commissioner when he develops the assessment ratios referred to in section 77-1506.04, R. R. S. 1943. Nor is there any express provision for appellate review.

The absence of notice and hearing are particularly pertinent when we consider the fact that the assessed valuations are presumptively correct. The county board of equalization has a duty to assess the property at 35 percent of its actual value, and, in the absence of evidence to the contrary, it is presumed to have performed that duty. Carpenter v. State Board of Equalization & Assessment (1965), 178 Neb. 611, 134 N. W. 2d 272.

The particular activities mandated by sections 77-1506.04 through 77-1506.08, R. R. S. 1943, are judicial rather than legislative in character, according to the standards enunciated in Ruwe v. School District (1931), 120 Neb. 668, 234 N. W. 789. It is obvious that the effect of these sections will be to require some property

owners to pay more taxes than they would pay other-
wise. Since financial burdens will be imposed upon
property owners through an exercise of judicial power
pursuant to specific terms of these statutes, due process
of law requires notice and an opportunity to be heard.

It is also apparent that the activities mandated by
these sections are equivalent to increasing assessed valua-
tions. We have long held that where an increase in the
assessed valuation of any classes of property as returned
by any county or counties is made by the State Board
of Equalization and Assessment without notice to such
county or counties and without affording sufficient op-
portunity to be heard, such increase amounts to confis-
cation of property without due process, and is therefore
a void increase of assessment. Northwestern Bell Tele-
phone Co. v. State Board of Equalization & Assessment
(1929), 119 Neb. 138, 227 N. W. 452.

The procedures contemplated by these sections will in-
evitably result in nonuniform taxation in violation of
the uniformity provision of Article VIII, section 1. The
true principle of taxation, the one enjoined by our Con-
stitution, is that of uniformity as to persons and prop-
erty within the particular district for which the tax is
imposed. Clother v. Maher (1883), 15 Neb. 1, 16 N. W.
902.

Under the provisions of Article VIII, section 1, of the
Constitution of Nebraska, the taxation of personal prop-
erty, except as otherwise authorized by such provision,
must be uniform not only as to the rate of taxation,
but as to the valuation of the property as well.

There can be no difference in the method of determin-
ing valuation or the rate of tax to be imposed unless the
separate classification rests on some reasonable public
policy, some substantial difference of situation or cir-
cumstance that would naturally suggest the justice or
expediency of diverse legislation with respect to the ob-

jects to be classified. State ex rel. Meyer v. McNeil (1970), 185 Neb. 586, 177 N. W. 2d 596.

It is evident from section 77-1506.05, R. R. S. 1943, and from the Tax Commissioner's testimony that the figures developed by the Tax Commissioner are based on assessment ratios of real estate only. Personal property and centrally assessed railroad property are not taken into account. It is also evident that the adjusted mill levies required by section 77-1506.07, R. R. S. 1943, are applicable to all taxable property, including locally and centrally assessed personal property and centrally assessed railroad property. The Tax Commissioner testified there was no necessary correlation between the assessment ratio of real estate in a particular county and the assessment ratio of locally assessed personal property. Certainly there was none with respect to centrally assessed personal property.

The assessment ratios developed by the Tax Commissioner are predicated upon the idea that real estate valuations tend to be unequal. The evidence adduced herein, however, indicates that valuations of locally assessed personal property tends to be uniform. Regardless, the mill levies determined under this statutory procedure are applied to all taxable property within the taxation district. The result necessarily is that identical centrally assessed property within the district is taxed differently, depending upon the county in which it is located. The effect upon locally assessed personal property is not clear, but to the extent valuations tend to be uniform the taxes imposed would necessarily be nonuniform.

The assessment ratios developed by the Tax Commissioner are intended to equalize tax burdens upon real property within a given taxation district. Plaintiff challenged defendant to show this would not cause nonuniformity in regard to other taxable property within the same district. That challenge was not met. The statute

necessarily causes nonuniformity as to centrally assessed property located in different counties of the same taxation district. Further, insofar as valuations of locally assessed personal property are uniform as between counties of that district, the scheme compels nonuniform taxation as to that property. This procedure is unconstitutional as violative of Article VIII, section 1, Constitution of Nebraska.

Plaintiff's brief discusses other factors which indicate the unconstitutionality of the statute. In view of what has been said heretofore, we see no occasion to consider them.

For the reasons given, we find section 77-202 (1) (d), as amended by section 2 of L.B. 945, and sections 77-1506.04 to 77-1506.08, R. R. S. 1943, to be unconstitutional. The judgment of the trial court is reversed and the cause is remanded for further proceedings pursuant to this opinion.

REVERSED AND REMANDED.

SMITH, J., not participating.

CLINTON, J., concurring in part and dissenting in part.

I agree that those sections of L.B. 945 dealing with intercounty equalization where a taxation district overlaps two or more counties are unconstitutional.

I do not agree that the portion of section 77-202 (1), R. R. S. 1943, exempting "(d) household goods, including major appliances either attached or detached to real property" is when properly construed unconstitutional because in violation of Article VIII, section 2, of the Constitution. That section of the Constitution, in my judgment, does not, as the majority opinion in effect states, authorize the Legislature to call black, white, and make it so. The Legislature has not attempted to do that in L.B. 945.

Subsection (1) (d) is obviously intended to exempt from taxation those items of property such as ovens, stoves, washing machines, clothes dryers, and dishwash-

ers which in recent history because of changes in home design and construction are now sometimes built in and semipermanently attached to the home, and which for this reason occupy an uncertain status in the technical terms of property law. The constitutional amendment was intended to meet this situation and enable the Legislature to treat on the same basis those homeowners who own such items attached or semiattached and those homeowners who own the same items but which are clearly personal property. As so limited and construed the statute ought to be said to be constitutional.