MAY BROADCASTING COMPANY, A CORPORATION, APPELLEE, V. JOHN M. BOEHM, STATE TAX COMMISSIONER, AND THE NEBRASKA DEPARTMENT OF REVENUE, APPELLANTS.

490 N.W.2d 203

Filed October 9, 1992.   Nos. S-89-502, S-89-503.

Robert M. Spire, Attorney General, and David Edward Cygan for appellants.

John C. Hewitt, of Andersen, Berkshire, Lauritsen & Brower, for appellee.

Paul C. Jessen and M. Shaun McGaughey, of Koley, Jessen, Daubman & Rupiper, P.C., for amicus curiae Pappas Telecasting of the Midlands/KPTM.

Paul C. Jessen and M. Shaun McGaughey, of Koley, Jessen, Daubman & Rupiper, P.C., for amici curiae Busse Broadcasting, Inc./KOLN and KGIN, et al.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

GRANT, J.

Defendants-appellants, John M. Boehm, State Tax Commissioner, and the Nebraska Department of Revenue (hereinafter, collectively, Department) appeal orders of the Lancaster County District Court, which orders reversed the findings and orders of the Department. The Department had assessed a use tax on the gross payments of plaintiff-appellee, May Broadcasting Company (hereinafter May), for various syndicated programming agreements between May and distributors.

In case No. S-89-503, on March 31, 1986, the Department assessed May a consumer's use tax deficiency for the tax period from August 1982 through July 1985. May paid the assessed deficiency and filed a petition for redetermination, seeking a refund of that payment, with the Department. After a hearing ending in April 1987, by order dated May 6, 1988, the Department denied the petition for redetermination. May appealed to the district court for Lancaster County, where on April 25, 1989, after consideration of the record made in the

Department's hearing, the district court reversed the Department's determination. The Department timely appealed to this court.

In case No. S-89-502, on December 2, 1987, May filed a use tax return for the period from August 1985 through December 1986 and paid, under protest, the total amount claimed by the Department to be due. On the same day, May filed a petition before the Department seeking a refund of the tax payment. The Department denied May's petition for refund, and May appealed to the district court for Lancaster County. There the matter was considered on the record made in the hearing before the Department, and on April 25, 1989, the district court reversed the determination of the Department and ordered the refund of the tax payment. The Department timely appealed to this court.

In this court, the cases were consolidated for briefing and argument. The Department has assigned three errors, contending that the district court erred (1) in "determining that the license of syndicated programing constitutes the transfer of intangible property rights and as such is not subject to Nebraska Consumer's Use Tax"; (2) in determining that the license of syndicated television programming "constitutes a 'sale for resale,' as contemplated by Neb.Rev.Stat. §§77-2701, et seq. and is, therefore, exempt from the Nebraska Consumer's Use Tax"; and (3) in making the previous two determinations because they are irreconcilable. There was no cross-appeal. The third assignment of error is without merit and will not be considered. In that regard, the district court made alternative findings disposing of the cases, in the event that this court determined that the district court had erred in its first disposition. Considering the two assignments of error submitted to us, we reverse the judgments of the district court.

The Department states that "[t]his is an appeal . . . from two Findings and Orders entered by defendant John M. Boehm, State Tax Commissioner, denying a use tax refund claim" and that since the appeals were filed prior to July 1, 1989, the court is required "to affirm the Commissioner's decision if the record demonstrates that it is supported by substantial evidence, is not arbitrary or capricious, and is not affected by error of law . . . ."

Brief for appellant at 2. That statement does not reflect the fact or the law. The cases before us are appeals from the district court for Lancaster County. Since proceedings for judicial review in case No. S-89-503 were filed in the district court on May 23, 1988, and in case No. S-89-502 on June 8, 1988, our review is de novo on the records. See *Department of Health v. Manor Care, Inc.*, 237 Neb. 269, 465 N.W.2d 764 (1991).

The Department hearings resulted in a "Findings And Order" of 67 pages in case No. S-89-503 and of 9 pages, incorporating the findings in case No. S-89-503, in case No. S-89-502. The review hearings in the district court resulted in a 22-page "Findings of Fact and Conclusions of Law" in case No. S-89-503 and a similar 6-page document, incorporating the 22-page document, in case No. S-89-502.

The records before the Department and before this court show the following facts. At all times relevant to these two cases, May operated in Omaha, under the call letters KMTV, as a television network affiliate. During certain periods of the broadcast day, May received and broadcast programming produced by the national network. May also obtained syndicated programming from independent distributors for those periods of its broadcast day during which it did not receive network programming. This type of syndicated programming is always stored by May for use by it at its convenience during the contract term.

During the period of time involved in case No. S-89-503, almost all syndicated programming was delivered to May on film or videotape by physical transfer of the film or videotape from the distributor to May. One program in particular, "The All New Let's Make a Deal," was delivered by satellite transmission from the distributor's transmitter to May's receiver, where the transmission was put on videotape and stored. During the second period, the time involved in No. S-89-502, 42 percent of the programming was delivered by satellite, and the remainder was delivered on film or videotape.

Generally, syndicated programming is copyrighted news and entertainment features sold to the highest bidder in a given television market. Agreements between distributors and television stations grant broadcast rights for a specific

television series or a group of movies and guarantee delivery of the agreed-upon programs, either by videotape or by satellite transmission, on or before certain dates. According to the terms of these agreements, licensees are prohibited from making copies of the programs, unless otherwise agreed to, and in such cases are usually required to destroy the copies. The television stations are also prohibited from exhibiting the programs at any time or place not provided for in the agreements. These agreements also provide that the broadcasts are to be made available to nonpaying audiences only.

Typical of the programs licensed to May in the audit periods are "Wheel of Fortune," "M*A*S*H," "Star Trek," and "Oprah Winfrey." Factors which determine how much a station pays for the syndicated programming include the demand in the market among the stations, the demand in the market among viewers, and when the station will be allowed to air the given program.

In its review of case No. S-89-503, the district court determined, as a matter of law, that "[t]he license of syndicated programming constitutes a transfer or use of intangible property rights and as such is not subject to Consumer's Use tax" and that "satellite transmissions of syndicated programming are clearly transfers of intangible property." The court also stated that since it had found the license of syndicated programming to be intangible, the court did not have to determine whether the provisions of the sale for resale definition within the tax code apply to May's situation. The district court, however, went on to determine that in the event that syndicated programming was determined to be a transfer of tangible property, the transfer of programming would be exempt from consumer's use taxation as a sale for resale.

These cases involve no actual dispute as to facts, but rather turn on interpretation of Nebraska's tax code and the application of that code to the undisputed facts. Statutory interpretation is a matter of law in connection with which an appellate court has an obligation to reach an independent conclusion irrespective of the determination made by the court below. *Weimer v. Amen*, 235 Neb. 287, 455 N.W.2d 145 (1990).

Appellant's first assignment of error asserts, "The District

Court erred in determining that the license of syndicated programing constitutes the transfer of intangible property rights and as such is not subject to Nebraska Consumer's Use Tax."

During the period of time from August 1, 1982, through August 25, 1983, the Nebraska use tax provision, Neb. Rev. Stat. § 77-2703(2) (Reissue 1981), provided: "A use tax is hereby imposed on the storage, use, or other consumption in this state of tangible personal property . . . ." The section was amended in 1983, and for the time from August 26, 1983, through September 30, 1985, the statute provided: "A use tax is hereby imposed on the storage, use, or other consumption in this state of tangible personal property . . . or of intellectual or entertainment properties referred to in subdivision (4)(c) of section 77-2702." § 77-2703(2) (Cum. Supp. 1984).

Neb. Rev. Stat. § 77-2702(4)(c)(ii) (Cum. Supp. 1984) clarified that the use tax on "gross receipts" would be assessed on "the gross income received from the license, franchise, or other method establishing the charge" for sales or leases of videotapes and movie film, except where admission is charged to view the movies.

In 1985, § 77-2703(2) was again amended. The statute, for the time from October 1, 1985, through December 31, 1986, provided:

> A use tax is hereby imposed on the storage, use, or other consumption in this state of tangible personal property purchased, leased, or rented from any retailer and on any transaction the gross receipts of which are subject to tax under subsection (1) of this section [the "gross receipts" provision of § 77-2702(4)(c)(ii).]

§ 77-2703(2) (Supp. 1985 & Reissue 1986).

The changes in the statute did not materially affect the meaning of the statute for the purposes of these cases. Each amendment was an effort to clarify the meaning of the statute, but the essential thrust of § 77-2703(2) (Reissue 1981) has not changed. The district court treated the statutes covering each audit period as having the same effect. There has been no cross-appeal by May, and this court will treat the statutes in the same way.

The district court set out in its findings and conclusions in case No. S-89-503 that "syndicated programming, no matter its method of delivery, constitutes an intangible property right and therefore is not subject to Consumer's Use tax." In support of its position, adopted by the district court, May noted a great deal of case law regarding taxation on the transfer of computer software and stated that syndicated programming was analogous to computer software. We recognize that this position has been adopted by a number of jurisdictions, but decline to apply this line of cases to this legal problem.

In appellee's brief, appellee hints at another reason for determining that syndicated programming is intangible and not subject to Nebraska's use tax and states:

> Technology has advanced to the point where a television station is no longer limited to renting a tape and broadcasting its contents by inserting that specific tape in the station's tape machine. Syndicated programs may be, and are, transmitted by satellite to a licensee station for recording on the station's own blank tapes. . . . Just as easily a distributor could transmit the program directly to the audience of a licensee station pursuant to a license contract. With syndicated programming, no tangible property need be transferred between the parties; tangible property is not a crucial element.

Brief for appellee at 23.

We disregard the implication to which appellee is obliquely referring. A transmission by satellite is the transmission of a tangible thing—an electronic signal. The mere fact that the signals may be received and stored shows that a tangible thing is in issue. The concept of physically storing an intangible thing is beyond comprehension. We hold that the method of transmission does not affect the applicability of the Nebraska use tax.

Typical of the software cases is *Commerce Union Bank v. Tidwell*, 538 S.W.2d 405 (Tenn. 1976), which held that what is sold in such a transaction is information and that the medium of transfer is only a method of transmission. The *Tidwell* court held that "[i]t is merely incidental that these intangibles are transmitted by way of a tangible reel of tape that is not even

retained by the user." *Id.* at 407. Thus, the *Tidwell* court held that the existence of alternative methods of delivery of software, i.e., telephone, magnetic tape, punch cards, etc., distinguished it from those cases involving movie films. The alternative methods of delivery of the information on the computer software would include a skilled person's going to the customer's place of business and personally encoding the program on the customer's computer equipment. Such a delivery would be purely by personal services, and not subject to a use tax.

In distinguishing this holding from its earlier ruling in *Crescent Amusement Co. v. Carson*, 187 Tenn. 112, 213 S.W.2d 27 (1948), the *Tidwell* court stated that the tax in *Crescent Amusement Co.* was levied on the movie film, which was inherently related to the movie, and stated, "[W]ithout the film there could have been no movie." *Tidwell*, 538 S.W.2d at 407. The court held that this distinction was "the crucial difference," *id.*, between use-taxable movies and use-tax-exempt computer software, stating, "The whole of computer software could be transmitted orally or electronically without any tangible manifestations of transmission." *Id.* at 407-08.

Results similar to the *Tidwell* "alternative methods of transmission" rationale are found in numerous software cases. Appellee states that because of the many methods of transmission of the syndicated programming, the software cases are more applicable to May's situation than are cases determining taxation of motion pictures for theater distribution.

We determine that the alternative methods analysis is not controlling in the decision as to the application of the use tax to syndicated programming. While we agree that the method of transmission is of little relevance to the broadcasters, we also determine that focus upon the method of transmission is misplaced. We look not at the method of transmission, but instead at the result of the transmission. In the software cases, the result of the transmission is a computer's responding in a certain way to certain stimuli. In the syndicated programming cases, the result is a broadcast over the airwaves.

In every case involving syndicated television, the desired result contracted for is a tangible film or videotape which may be played and broadcast by the station. Although the videotapes require machines to "encode" and "decode" them, the videotapes are tangible, unique, material items altered by the distributor to suit the customer. A videotape imprinted with a licensed-for program is an item of tangible personal property. Contrary to appellee's contention, the frequent requirement that broadcasters destroy copies of programming upon the expiration of their licenses does not indicate an intangible quality to the product licensed. This merely demonstrates the ease with which copies are made.

The Department directs this court to a growing body of case law which deals directly with taxation of syndicated programming, and we find this law persuasive. The body of these decisions is based on early cases determining the issue of taxability of movie film rentals by theaters.

Typical of the film rental holdings is *Crescent Amusement Co. v. Carson, supra*, in which motion picture theater operators appealed the assessment of sales taxes on rentals of motion pictures from distributors for exhibition in appellants' theaters. The theater operators asserted that the transactions were grants of the privilege to use and exhibit copyrighted material and that, therefore, the operators were merely exercising an intangible (and hence nontaxable) property right. The Tennessee Commissioner of Finance and Taxation countered that the transaction was a lease of tangible personal property and thus subject to the broad definition applying the state sales tax.

The *Crescent Amusement Co.* court agreed with the commissioner. Citing *Matter of United Artists Corp. v. Taylor*, 273 N.Y. 334, 7 N.E.2d 254 (1937), the Tennessee court noted that the transaction necessarily involved the transfer of corporeal property in the form of positive and negative prints, with the license to exhibit these films. This amounted to a singular transaction, involving tangible property, and thus was taxable as a sale.

The *Crescent Amusement Co.* court also cited *Saenger Realty Corporation v. Grosjean*, 194 La. 470, 193 So. 710

(1940), which reached a similar conclusion. The *Saenger Realty Corporation* court held that the right to exhibit a film could be of no greater value than the use of the film.

The courts applying the *Crescent Amusement Co.* rationale to syndicated programming cases have recognized that both motion picture rentals by theaters and syndicated program "licenses" transfer tangible possession and control of a recorded event. Appellee equates this recognition to a "lack [of] independent analysis" and blind reliance on outdated precedent. Brief for appellee at 16. We do not agree. These films and videotapes are tangible, no less so than if the event were recorded in a book or newspaper—neither of which could reasonably be characterized as intangible.

In *American TV Co. v. Hervey, Comm'r*, 253 Ark. 1010, 490 S.W.2d 796 (1973), the Arkansas Supreme Court addressed the assessment of a use tax on the use by American Television Company (ATC) of videotaped motion picture films, syndicated programming, and other artistic performances. The appellant, ATC, asserted that the Arkansas tax (similar to our own) is only assessed on tangible personal property. ATC contended that it acquired only an intangible "right to broadcast." (Emphasis omitted.) *Id.* at 1014, 490 S.W.2d at 799. The Arkansas Commissioner of Revenue held that when a television station takes possession of a film, loads it, and broadcasts it, that station uses that tangible personal property so as to make the use taxable.

The Arkansas court turned to its state sales tax statute defining "sale" as a "transfer . . . of tangible personal property, regardless of the manner, method, instrumentality, or device by which such transfer is accomplished." Ark. Stat. Ann. § 84-1902 (Repl. 1960).

The court held:

> Every purchase or rental of property is the acquisition of the right to use that property for its intended purposes. Likewise, practically every piece of property subject to rent or sale is a product of someone's original idea and the rental thereof is for the purpose of using it.

*American TV Co.*, 253 Ark. at 1018, 490 S.W.2d at 801 (quoting from *Florida Association of Broadcasters v. Kirk*, 264

So. 2d 437 (Fla. App. 1972)).

The court then concluded that to separate the right to use from the possession of the videotape would create an impossible tax situation and held the sales tax to be applicable. See, also, *Mt. Mansfield Television v. Commr. of Taxes*, 133 Vt. 284, 336 A.2d 193 (1975).

We find the reasoning in these cases to be persuasive. We recognize that an examination of the issues raised in these actions makes it clear that there is a split of authority on the issues presented. Taking into consideration the opposing views, we are persuaded by the cases advanced by the Department rather than the cases advanced by May. It would seem anomalous to separate the right to broadcast copies of these syndicated programs from the necessary physical possession of them. We hold that the basis of these courts' decisions is sound. Although there is a purchase or rental in these cases of an intangible right to use, the value of the agreements between television stations and distributors is based on the physical possession by the stations of a copy of the original film or videotape. In the cases before us, the television stations usually operate from a videotape or film transferred to them or from a videotape which the television station had made and stored. As such, the transactions are transfers of tangible personal property and are taxable.

The Department's second assignment of error asserts that it was error for the district court to find that "the license of syndicated television programming constitutes a 'sale for resale' as contemplated by Neb.Rev.Stat. §§77-2701, et seq. and is, therefore, exempt from Nebraska Consumer's Use Tax."

It is May's contention that the Nebraska sales and use tax applies only to retail sales, see § 77-2703 (Reissue 1986), and because the property in question here is purchased by broadcasters for "resale," the transaction is exempt from tax, pursuant to § 77-2703.

Section 77-2702(11) (Reissue 1986) provides:

Retail sale or sale at retail shall not include the sale of:

(a) Tangible personal property which will enter into and become an ingredient or component part of tangible personal property manufactured, processed, or fabricated

for ultimate sale at retail.

Section 77-2702(14) provides that a "sale for resale" includes:

tangible personal property [purchased] for the purpose of reselling it in the normal course of . . . business, either in the form or condition in which it is purchased or as an attachment to or integral part of other tangible personal property.

The parties differ as to what is the product sold by May to advertisers. The Department asserts that the property sold is not the syndicated programming, but an entirely different commodity—a television broadcast for a certain audience. May contends, however, that it simply resells, in a modified form, what is purchased—syndicated programming. It is May's contention that if this court defines syndicated programming as tangible, then the sale for resale statute exempts the second transaction from taxation.

The Department contends that the cases depended upon by May for support in this area should not be followed in the present cases. The facts in one of the cases May depends upon, *Midcontinent Broadcasting v. Rev. Dept.*, 424 N.W.2d 153 (S.D. 1988), are much the same as the facts in the cases before us. The South Dakota Supreme Court first held, as does this court in this decision, that the syndicated programming was tangible personal property purchased by television stations for distributors.

Next, the *Midcontinent Broadcasting* court held that the transaction between the stations and advertisers was a sale to the advertisers of a necessary element of the television station's final product: "broadcast time." *Id.* at 155. The court held that like newspapers' combining information, advertising, and entertainment in a form to be resold to readers, a purchase of syndicated programming for incorporation into a television station's broadcast was a purchase for resale and was thus not taxable under the provisions of South Dakota law.

The South Dakota Supreme Court noted its earlier holding of *Sioux Falls Newspapers v. Sec'y of Rev.*, 423 N.W.2d 806 (S.D. 1988), in which it held syndicated materials were purchased with the intent to reproduce them in the newspaper

and sell to readers. The court held in *Sioux Falls Newspapers* that the syndicated materials were purchased for resale in the ordinary course of business and, pursuant to S.D. Codified Laws Ann. § 10-46-1(2) (1989), were thus nontaxable resale uses under the South Dakota use tax, which is very similar to our own.

The *Midcontinent Broadcasting* case was decided in South Dakota under different taxing statutes. For one thing, certain services are taxable in South Dakota while no services are taxable in Nebraska. Apparently, in South Dakota, advertising is a type of service exempted from the service tax. It is apparent that in considering a taxable event, the concept of a use or sales tax on services presents different questions than the problem before us. We hold that the *Midcontinent Broadcasting* case is not persuasive in the analysis of the problem before this court.

We do agree fully, as set out above, with that portion of the *Midcontinent Broadcasting* case holding that syndicated programming is tangible personal property subject to a use tax. We do not hold that, under Nebraska law, May's product sold to its advertisers is tangible property, nor do we hold that the product sold by May to its advertisers is a resale of the product purchased by May from the syndicated program distributors.

First of all, as stated earlier in this opinion, the tangible product purchased by May from its distributors is a film or videotape, together with the right to use that film or videotape.

The products purchased by May cannot, by the terms of May's agreements with the distributors, be resold to others. What May sells to its advertisers is the right for the advertiser to present its message to a certain audience watching the broadcast film or videotape. May's sale to its advertising customers is a sale of right to present advertising during a film or videotape broadcast. May's purchase from its distributors is the purchase of a film or videotape in tangible form for later broadcast. It cannot be said that what May sells is a resale of what it bought.

A further reason for holding that May's sales of its product to its advertisers do not constitute sale for resale of the product bought by May is that the product purchased by May is tangible as set out above, but the product sold by May is intangible. Section 77-2702(14) provides that a sale for resale consists of

tangible property.

May's national sales manager, when asked what kind of a product May had to sell, testified:

> Our product is basically, let me start first with, our clients are those who want to advertise on our station. And, the reason they want to advertise on our station, is to reach the audience that watches the programs that we carry. So actually, I think our product can be defined as the audience we reach.

What is sold by May to each potential advertiser is a specific audience as determined by demographic studies available to both May and its advertisers.

The time sold by the television station to its advertisers is time in which to display advertising to an audience. The time is available within the broadcast of a film or videotape which May broadcasts over the airwaves to be received without charge by viewers. Primarily, prices for advertising time are based on the size and type of audience watching a program and on when the program airs. An advertiser will choose when to air its commercials based on when it will most economically reach its targeted audience.

After 20 pages of testimony explaining how the demographics of a potential audience influence advertising rates, May's sales manager stated, "It's extremely volatile to pricing and selling television time, because of the nature of the product. It's so intangible."

Because the "product" May sells to advertisers is not the same product it buys from distributors and because the product sold to advertisers is not tangible, we hold that the exemption within §§ 77-2702 and 77-2703 does not apply to May's product, and the transactions between May and its advertisers are not sale for resale of the product May purchased from its distributors.

Appellee in its brief raises the question of the constitutionality of Nebraska's use tax, in that appellee contends the tax violates the First Amendment. The issue of the constitutionality of the use tax was not decided by the district court, since it decided the case on other issues. The Department, as appellant, did not raise the issue. The appellee

did not raise the issue, as one which should have been decided, in a cross-appeal. The question of constitutionality is not before us.

The judgments of the district court are reversed, and the causes are remanded to the district court with directions to enter an order in each case in favor of appellants in conformity with this decision. Appellee's motions in each case for costs, including attorney fees, are denied.

REVERSED AND REMANDED WITH DIRECTIONS.

BOSLAUGH, J., dissenting in part.

The use tax involved in these cases is imposed on "the storage, use, or other consumption in this state of tangible personal property." See Neb. Rev. Stat. § 77-2703(2) (Reissue 1986). The majority opinion of the court holds that the purchase of syndicated programming, without regard to the method of transmission to the purchaser, is subject to the tax.

In *Moeller, McPherrin & Judd v. Smith*, 127 Neb. 424, 255 N.W. 551 (1934), this court described tangible personal property as personal property having a physical existence and referred to a dictionary definition that tangible meant capable of being touched. That case involved a statute in which the Legislature had attempted to tax intangible property as if it were tangible. This court held that the Legislature could not define and designate as tangible that which is, in fact and in truth, intangible. See, also, *MAPCO Ammonia Pipeline v. State Bd. of Equal.*, 238 Neb. 565, 471 N.W.2d 734 (1991); *State ex rel. Meyer v. Peters*, 191 Neb. 330, 215 N.W.2d 520 (1974).

The records in these cases show that some syndicated programming is transmitted to the purchaser by means of radio waves. It seems to me that to the extent that syndicated programming is transmitted to the purchaser by that means, the purchaser has not received tangible personal property from the seller which can be taxed as such.

HASTINGS, C.J., joins in this dissent.